360 P.2d 386

**AIRCO SUPPLY COMPANY, Inc., a New Mexico Corporation, Plaintiff-Appellant,**

v.

**ALBUQUERQUE NATIONAL BANK, a National Banking Corporation, Defendant-Appellee.**

No. 6747.

Supreme Court of New Mexico.

March 15, 1961.

Fred L. Nohl, Albuquerque, for appellant.

Modrall, Seymour, Sperling, Roehl & Harris, Daniel A. Sisk, Allen C. Dewey, Jr., Albuquerque, for appellee.

COMPTON, Chief Justice.

Appellant, Airco Supply Company, Inc., plaintiff below, brought this action against the Albuquerque National Bank, defendant below, to recover monies paid out on forged checks charged to its account. The district court denied recovery and this appeal follows. For convenience, we will refer to appellant as Airco.

A narration of Airco's general business practices, particularly with respect to appellee, is required. Airco has maintained a commercial checking account in appellee's bank since December, 1956. At the time the account was opened, the bank's signature card was signed by W. M. Carroll and H. H. Carroll, his wife, and they were the only persons authorized to draw checks against Airco's account. They owned sixty-three percent of the voting stock, and W. M. Carroll managed and operated the business and made all the policy decisions.

Airco is engaged in the business of distributing supplies such as refrigeration units, air conditioners, heating equipment and the like. It makes purchases from some two to three hundred different manufacturers, paying these suppliers with checks signed by W. M. Carroll, president of the

company. Its bookkeeper from February of 1958 to December of 1958 was Emily Duran. In the course of her employment, Emily Duran prepared all of Airco's checks for the signature of either W. M. Carroll or H. H. Carroll.

During the period of time between February 10, 1958, and November 4, 1958, a series of twenty forged checks were drawn on Airco's account, sixteen of which were made payable to the B & E Co. The signature of W. M. Carroll as drawer had been forged on each by Emily Duran, and, in addition, the checks bore endorsements made by Emily Duran. Each of the forged checks was deposited in the account of "J. B. or Emily Duran" at the Bank of New Mexico, except one check made payable to the Bank of New Mexico, one to Southwestern Company and two made payable to the Oasis Co. Airco did no business whatever with the B & E Co., Oasis Co., Southwestern Company or the Bank of New Mexico.

The record discloses that even though the first four forged checks were returned to Airco in February, 1958, the forgeries were not discovered until December, 1958, when Airco's annual audit showed an inventory shortage of some $35,000. When this fact was discovered, the appellee bank was alerted that a series of checks had been forged on the account of Airco Supply Company. Subsequently, the validity of each check issued by Airco was confirmed by telephone conversation prior to payment and a new series of check numbers was arranged.

The appellee bank prepared two statements a month for Airco, and W. M. Carroll usually called in person at the bank for the cancelled checks and statements. Mr. Carroll did not look at the cancelled checks or statements before placing them in an office file. At the end of each month a firm of auditors and accountants secured the checks and bank statements and reconciled the books. According to the testimony, it was not their job to determine the propriety of the checks drawn on the account or to determine whether Carroll had signed all the checks. The auditors were not furnished with invoices or vouchers showing to whom payments were in fact owing, and they did not know what firms or persons with which Airco did business.

The trial court found that each of the sixteen checks made payable to the order of B & E Co. "was payable to the order of a fictitious or non-existing or living person not intended to have any interest in it, and that such fact was known to the person making said checks so payable." The court, therefore, concluded that these particular checks were payable to bearer.

Appellant recognizes that the court's legal conclusion flowing from the finding of fact is correct. A check drawn to a fictitious payee or others listed in §

50-1-9, NMSA, 1953 Comp., is the same as if it were made payable to bearer. Mueller & Martin v. Liberty Insurance Bank, 187 Ky. 44, 218 S.W. 465. And, since an endorsement on such paper is not necessary to its validity or negotiability, a bank is not liable for paying on a forged endorsement on bearer paper. Britton, Bills and Notes, § 149; Prugh, Combest & Land, Inc., v. Linwood State Bank, Mo. App., 241 S.W.2d 83; Bartlett v. First National Bank of Chicago, 247 Ill. 490, 93 N.E. 337.

But appellant contends that the finding made is not supported by substantial evidence. It is appellant's position that the sixteen checks were not bearer paper and thus the bank, under the general rule, is liable for paying out monies on forged endorsements. Britton, Bills and Notes, § 142.

Before discussing the substantial evidence issue, we would point out that no problem is presented as to whether "person making it so payable" refers to the actual maker or the nominal maker. See Mueller & Martin v. Liberty Insurance Bank, supra. This is because § 50-1-9, NMSA, 1953 Comp., provides in pertinent part as follows:

"The instrument is payable to bearer: * * * When it is payable to the order of a fictitious or nonexisting or living person not intended to have

any interest in it, and such fact was known to the person making it so payable, *or known to his employee or other agent who supplies the name of such payee. * * *"* (Emphasis ours.)

In our opinion there is substantial evidence to support the court's finding that the sixteen checks made payable to the B & E Co. "were payable to the order of a fictitious or non-existing or living person not intended to have any interest in it."

It is not controverted that Emily Duran was an employee of appellant and that she supplied the names of the payees on the checks. She made out all sixteen checks, inserting the name B & E Co. as the payee and filling in the date, amount and signature of W. M. Carroll. Although she customarily prepared checks only when given vouchers by Mr. Carroll, no vouchers for B & E Co. had been given to her and there was no reason for Airco to make B & E Co. the payee on any of its checks. Airco had no business with any firm known as B & E Co., Mr. Carroll testifying that he had never heard of such a company.

After preparing the checks, Emily Duran wrote the endorsements "B & E Co." and "J. B. Duran" on the back of each. J. B. Duran was Emily Duran's husband and Airco had no business dealings with him. All of the checks made payable to B & E Co. and endorsed in the manner stated

above were deposited to the joint account of "J. B. or Emily Duran" in the Bank of New Mexico. This bank in turn paid out money in the amount of these deposits on checks drawn upon the Duran account.

■ The above facts constitute substantial evidence that if a B & E Co. did in fact exist, Emily Duran had no intention whatever that it should have any interest in the proceeds of these checks. This is the only reasonable inference that can be drawn from the evidence, and, in reviewing the evidence, all reasonable inferences supporting the trial court's judgment will be indulged by this court. Totah Drilling Company v. Abraham, 64 N.M. 380, 328 P.2d 1083.

■ Appellant insists, however, that since Emily Duran did not testify in person, there is no evidence as to her actual intent. This contention overlooks the principle that inferences may properly be drawn from circumstantial evidence, and that a well-connected train of circumstances, as are present in this case, is as cogent of the existence of a fact as any array of direct evidence, and may even outweigh opposing direct testimony. Robinson v. Southern New England Tel. Co., 140 Conn. 414, 101 A.2d 491; McCready v. Atlantic Coast Line R. Co., 212 S.C. 449, 48 S.E.2d 193. See Lopez v. Townsend, 42 N.M. 601, 82 P.2d 921.

The next issue is whether the trial court correctly concluded that the drawee bank was entitled to debit the appellant's account for payment made on checks on which the *drawer's* signature had been forged.

■ It is the generally accepted rule that in the first instance the drawee bank has no right to debit the account of a depositor on a check which bears a forged signature of the drawer. Denbigh v. First National Bank of Seattle, 102 Wash. 546, 174 P. 475; Britton, Bills and Notes, § 132. The undertaking of the bank is to pay according to the depositor's order to the extent of his balance. If the depositor has done nothing to lead the bank reasonably to believe that a forged check is genuine, and has acted prudently under the circumstances, the payment of a forged check does not operate to decrease the bank's indebtedness. So when nothing else happens it is quite correct to say that "the bank pays at its peril." Arant, Forged Checks—The Duty of the Depositor to His Bank, 31 Yale L.J. 598.

But, while the drawee bank does not have the right, in the first instance, to debit the account of the depositor on forged checks, subsequent events may relieve the bank of any liability for such action. Britton, Bills and Notes, Section 132. This principle is stated as follows in Morgan v. United States Mortgage & Trust Co., 208

N.Y. 218, 101 N.E. 871, 872, L.R.A.1915D, 741:

"(1) The general rule of law is that a bank may pay and charge to its depositor only such sums as are duly authorized by the latter, and of course a forged check is not authority for such payment.

"(2) It is, however, permitted to a bank to escape liability for repayment of amounts paid out on forged checks by establishing that the depositor has been guilty of negligence which contributed to such payments and that it has been free from any negligence. * * *"

The foregoing rule of law frequently necessitates that the problem be considered with reference to two separate classes of checks, first with reference to forged checks paid and returned with the first monthly statement received by the depositor after the series of forgeries began; and secondly, as to checks similarly and subsequently forged. A bank's claim to credit rests on different principles as to the two classes of payments. Arant, Forged Checks—The Duty of the Depositor to His Bank, 31 Yale L. J. 598, supra.

 It is true that as to the four forged checks paid prior to the time the first cancelled checks had been returned after the series of forgeries began, the appellant had done nothing whatever to mislead the bank, thereby inducing it to pay out money on the forged checks. Thus, as to these checks, no estoppel could be raised against the appellant depositor. First National Bank of Birmingham v. Allen, 100 Ala. 476, 14 So. 335, 27 L.R.A. 426; National Dredging Co. v. President, etc., of Farmers' Bank of State of Delaware, 6 Pennewill 580, 22 Del. 580, 69 A. 607, 16 L.R.A.,N.S., 593.

 However, appellant is precluded from holding the bank liable for paying out on the first eight forged checks, four of which were returned with the first statement after the forgeries began, since it failed to give the bank notice within the time prescribed by § 48-10-8, NMSA, 1953 Comp. This section provides:

"Forged or raised check—Liability of bank—Limitation.—No bank which has paid and charged to the account of a depositor any money on a forged or raised check issued in the name of said depositor shall be liable to said depositor for the amount paid thereon unless either (1) within six (6) months after notice to said depositor that the vouchers representing payments charged to the account of said depositor for the period during which such payment was made are ready for delivery, or (2) in case no such notice has been given, within six (6) months after the return to said depositor of the voucher representing such payment,

said depositor shall notify the bank that the check so paid is forged or raised."

Turning now to the forged checks which were issued and notice given to the bank within the six-month statutory period, the determination whether appellant depositor or appellee bank must bear the loss is contingent upon the actions of both. The rule is stated thusly in Hammerschlag Mfg. Co., Inc. v. Importers' & Traders' National Bank, 2 Cir., 262 F. 266, 271.

"The failure, however, of a bank depositor adequately to examine his passbook and vouchers, and to give the bank prompt notice of any errors he may discover, is no defense to the depositor's right to recover the money so paid from the bank, if the bank's officers, before paying the checks, could have detected the forgeries, if they had exercised reasonable care. * * *"

■ The trial court found that the appellee bank had at all times exercised due care and diligence in the handling of appellant's account. This finding is supported by substantial evidence. There was nothing on the face of the checks to arouse the bank's suspicions. Pacific Coast Cheese, Inc. v. Security-First National Bank, 45 Cal.2d 75, 286 P.2d 353. In fact, even after comparison of the forged checks with the genuine signature cards, Mr. Whitehill, called as a handwriting expert, testified that he himself would have passed as genuine each of the twenty forged checks. Thus even had the bank compared each of the forged checks with the signature card prior to payment, the forgeries still would not have been detected.

Further, the undisputed testimony also established that the methods employed by other banks in the community were substantially the same as, or corresponded to, the methods used by the appellee bank. Certain bank officials and employees testified as to the nature of the several examinations which each signature on a check receives before such check is charged against the account of a depositor.

Again turning to the actions of the appellant depositor, the court found that it failed to exercise due care and diligence in examining the returned cancelled checks and statements of account, and that the loss resulted solely and proximately from this negligence. These findings are also challenged by appellant. The general rule is clearly established that a depositor is under an implied duty to the bank to make, or have made, an adequate examination of the cancelled checks which are returned to him by the bank at regular intervals. Brady, The Law of Forged and Altered Checks, p. 449; Brady on Bank Checks, pp. 289–290; 15 A.L.R. 159; 67 A.L.R. 1124; 103 A.L.R. 1148.

The trial court obviously determined, and we agree, that appellant's conduct, after

the return of the first four forged checks, was something less than that which is dictated by ordinary business custom. Morgan v. United States Mortgage & Trust Co., supra. The witness Carroll admitted that he failed to look at the cancelled checks which the bank returned to him, that no one in the organization had been instructed to examine the cancelled checks, and, in effect, that had he examined the returned checks or the company's journal, the last sixteen forged checks would have been discovered.

The witness Solberg, one of appellant's accountants, testified that his firm only balanced and reconciled the books, and that they were not charged with the duty of determining the propriety of the various checks drawn on the account or of determining whether Carroll had actually signed all of the checks. Such delegation of examination of returned checks and bank statements to an outside accountant is not an adequate fulfilment of the depositor's duty to the bank unless such accountant is furnished with the necessary books, records and data from which to detect a forged check, as for example by comparing the invoices with the payees shown on the checks. See Union Tool Company v. Farmers' & Merchants' National Bank, 192 Cal. 40, 218 P. 424, 28 A.L.R. 1417; Morgan v. United States Mortgage & Trust Co., supra; Hammerschlag Mfg. Co., Inc. v. Importers' and Traders' National Bank, supra.

The sum and substance of Carroll's own testimony is to the effect that the last sixteen forgeries in the series could have been avoided had he examined the cancelled checks and company journal, or had he furnished the invoices to the accountants with instructions to compare these against the journal. If Carroll did not desire to follow one of these procedures, this duty should have been delegated to someone else in the organization.

The following statement contained in Brady, The Law of Forged and Altered Checks, pp. 448, 449, seems quite appropriate under the facts of this case:

"* * * the methods adopted by dishonest employees for appropriating their employers' bank accounts, while frequently daring, are usually simple in structure and execution and of a sort which could be easily frustrated by proper supervision in the matter of examining the bank statements."

We conclude that there is substantial evidence to support the trial court's finding that appellant did not exercise the degree of care dictated by prudent business custom and as usually adhered to by businessmen under like circumstances.

The next question is whether there is substantial evidence to support the finding that lack of due care on the part of appellant was the proximate cause of the loss. In our

opinion the record contains substantial evidence to support this finding.

When the appellant finally discovered the long series of forgeries and so notified the bank, no further losses occurred. Upon notification, the bank changed the series numbers of appellant's checks, arranged to call Mr. Carroll each time one of appellant's checks was presented, and mailed the cancelled checks and statements directly to the Carroll home. Had Carroll or a delegatee adequately examined the cancelled checks returned to him which contained the first four forged checks, noting in particular the payees thereon, the only reasonable inference is that the forgeries would then have been detected and the necessary precautions taken at that time.

Furthermore, there is no question but that the undue delay in discovering the forgeries prejudiced the bank. It was deprived of the opportunity to take steps leading to restitution while the forger, and some or all of the monies, remained available. Leather Manufacturers' Nat. Bank v. Morgan, 117 U.S. 96, 6 S.Ct. 657, 29 L.Ed. 811; Arant, Forged Checks—The Duty of the Depositor to His Bank, 31 Yale L.J. 598, supra; Britton, Bills and Notes, § 132.

Closely related to the issue of substantial evidence as to the care exercised by the bank and depositor is appellant's contention that the trial court erred in denying its motion to strike any evidence that might be construed as indicating negligence on appellant's part. This motion was made by appellant at the close of the testimony of Mr. Carroll, appellant's second and major witness. The crux of this contention appears to be that rather than attempting to establish appellant's lack of due care by way of cross-examination, this issue should have been deferred until the appellee bank had put on evidence showing its exercise of due care in handling appellant's account.

 It is quite true that before a bank can be relieved of liability for forged checks debited against the depositor's account by reason of the latter's negligence, the bank as a prerequisite must sustain the burden of proving both the exercise of due care in the handling of the account and the failure of the depositor to exercise due care. Basch v. Bank of America Nat. Trust & Savings Ass'n, 22 Cal.2d 316, 139 P.2d 1; 6 Zolman on Banks and Banking, p. 366. However, the appellee bank did undertake the burden of proving both issues, and we find nothing in the record indicating that the court was of the opinion that the burden of proof on either of these issues was upon the appellant. What this point actually involves is the proper order of proof, and this is a matter committed to the sound discretion of the trial court. This principle is set forth in 5A C.J.S. Appeal and Error § 1605, as follows:

"Rulings of the trial court as to the order in which evidence shall be introduced will not be reviewed unless there is an abuse of the discretion with which the court is vested in such matters."

No abuse of discretion is present in this case.

It is necessary once again to refer to § 48–10–8, supra, requiring that notice of forged checks be given to the bank within six months as a condition precedent to holding the bank liable for paying out money on a forged check. The trial court found that eight of the checks in question were returned to the appellant by the appellee prior to June 1, 1958, and that the appellant failed to notify the bank until December 10, 1958, that any of the checks were or might be forged. Based on these findings, the trial court concluded that by virtue of § 48–10–8, supra, the appellant was barred from recovery on any of the eight checks returned and received by the appellant prior to June 1, 1958.

■ Appellant does not challenge the findings upon which the court's conclusion was based. The attack on the conclusion is two-fold: (1) that § 48–10–8, supra, is applicable only in cases where the drawer's signature is forged and not where the instrument contains, in addition, a forged indorsement, and (2) that § 48–10–8, supra, is unconstitutional as special legislation. Appellant's first attack is without

merit. The checks involved in this case contained *both* a forged drawer's signature and a forged indorsement. Thus the fact that similar statutes have been construed by courts in other jurisdictions to be inapplicable to checks where *only* the indorsement is forged are not in point.

The same contention was made in Herbel v. Peoples State Bank of Ellinwood, 170 Kan. 620, 228 P.2d 929, 934, where the court resolved this issue by stating as follows:

"* * * The mere fact indorsements were forged on the particular checks in which the plaintiff was made the payee in nowise alters the fact that on their face not only the name of the payee but also the name of the maker was forged. They were forged checks. It, therefore, follows * * * that the bank was not liable unless the depositor notified the bank in conformity to the provisions of the statute. And such nonliability of the bank resulted by virtue of the statutes irrespective of the bank's negligence. That is the clear legislative mandate and the courts are bound by it."

■ Finally, as noted previously, appellant challenges the constitutionality of § 48–10–8, supra, contending that it is special legislation prohibited by art. 4, § 24 of the New Mexico Constitution, in that the statute has selected banks out of a group of drawees

to give them a special limitation of action that applies only to one class of commercial paper, i. e., checks. Appellant's position in this regard is untenable. The fact that the legislature is entitled to enact statutes which apply only to limited subjects or persons without having the effect of making them special legislation was recognized by this court in State v. Atchison, T. & S. F. Ry. Co., 20 N.M. 562, 151 P. 305.

Basically the test as to whether such legislation is general, and therefore constitutional, depends upon the reasonableness of the classification and whether the statute is general to the class it embraces, operating uniformly on all members of that class. Crownover v. Crownover, 58 N.M. 597, 274 P.2d 127; Hoover v. City of Albuquerque, 58 N.M. 250, 270 P.2d 386; State v. Spears, 57 N.M. 400, 259 P.2d 356, 39 A.L.R.2d 595; Hutcheson v. Atherton, 44 N.M. 144, 99 P.2d 462; Davy v. McNeill, 31 N.M. 7, 240 P. 482. The legislature could certainly have decided reasonably that this statute should be restricted to banks and to checks rather than to all persons who are drawees of bills of exchange and to all types of commercial instruments. First Thrift & Loan Association v. State, 62 N.M. 61, 304 P.2d 582.

The Missouri court said in the case of Massey-Harris Harvester Co. v. Federal Reserve Bank of Kansas City, 340 Mo. 1133, 104 S.W.2d 385, 388, 111 A.L.R. 133:

"Surely a classification of banks in a separate class from the other collecting agents mentioned is entirely reasonable both on the basis of daily volume handled, facilities furnished, and kind of service rendered. * * *"

We make the observation that at least sixteen states have adopted statutes requiring a bank depositor to report to his drawee bank any payment made on a forged check within a specified time after the cancelled check has been returned to the depositor. The time allowed for giving such notice varies from sixty days to one year. Brady, The Law of Forged and Altered Checks; Britton on Bills and Notes, § 132. See 50 A.L.R.2d 1115. Our research does not disclose that such a statute has ever been held unconstitutional on the ground urged by appellant, and we hold that § 48–10–8, supra, is not unconstitutional as special legislation since the classification contained therein is both reasonable and rational.

The judgment should be affirmed. It is so ordered.

CHAVEZ and MOISE, JJ., concur.

CARMODY and NOBLE, JJ., not participating.